## In re WITHERBEE COURT CORPORATION. *
### No. 250.

Circuit Court of Appeals, Second Circuit.

Feb. 15, 1937.

*Writ of certiorari denied Klce Corporation v. Roosevelt, 57 S.Ct. 937, 81 L.Ed. ——

L. HAND, Circuit Judge, dissenting.

Robert P. Weil, of New York City, for appellant Klee Corporation.

Newman & Bisco, of New York City (Robert P. Weil and David Barnett, both of New York City, of counsel), for appellant Maufacturers Trust Co.

Breed, Abbott & Morgan, of New York City (Charles H. Tuttle, Stoddard B. Colby, and Ernest Brooks, Jr., all of New York City, of counsel), for appellees.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

The debtor corporation's sole asset is an apartment building in Pelham Manor, N. Y. The property is subject to a first mortgage in the principal amount of $371,000, with overdue interest thereon which brought to $437,425.07 the total amount due on March 16, 1935, the date of the filing of the debtor's petition. It is subject also to a second mortgage securing an indebtedness which amounted to $92,997.16 on the same date. There are also claims for federal income taxes and state franchise taxes and a small amount of unsecured debts. Upon a reference to a special master the debtor was found to be insolvent and the value of the mortgaged property to be "less than $400,000." This finding was approved by the District Court. The confirmed plan of reorganization contemplates transfer of the property, free of debt, to a new corporation which will issue bonds and stock to be distributed to the debtor's first mortgage bondholders. Provision is also made for payment in cash of the federal and state tax claims. Second mortgagees, unsecured creditors, and stockholders of the debtor will receive nothing. Consents to the plan were sought only from the first mortgage bondholders. With leave of this court the Klee Corporation, owner of the second mortgage, and Manufacturers Trust Company, pledgee thereof, have appealed from the order of confirmation.

The appellants argue that the court erred in matter of law in determining their second mortgage lien to be worthless. They do not question the accuracy of the appraisal as a finding of fact, but contend that they were entitled to have the property sold at a judicial public sale. The argument has two branches: (1) That section 77B, Bankr.Act (11 U.S.C.A. § 207), does not authorize the elimination of liens by

appraisal; and (2) that, if it be construed to do so, it runs foul of the Fifth Amendment. Clause (5) (c) of subdivision (b), section 77B (11 U.S.C.A. § 207(b) (5) (c), declares: "(b) A plan of reorganization * * * (5) shall provide in respect of each class of creditors of which less than two thirds in amount shall accept such plan * * * adequate protection for the realization by them of the value of their interests, claims, or liens * * * (c) by appraisal and payment."

This appears to be express authority for such an appraisal as was made, but the appellants contend that it cannot have that meaning because of the sentence which appears toward the end of subdivision (b), 11 U.S.C.A. § 207(b), as follows: "In the case of secured claims entitled to the provisions of clause (5) of this subdivision (b), the value of the security shall be determined in the manner provided in section 57, clause (h) of this Act [section 93, clause (h) of this title], and if the amount of such value shall be less than the amount of the claim, the excess may be classified as an unsecured claim."

The argument runs that, since appraisal is not permitted under section 57h (11 U.S.C.A. § 93(h), when the agreement of the parties provides a method (foreclosure) of converting the security into money (Remington, Bankruptcy [3d Ed.] § 923), it is not available under 77B (b) (5) (c). This in effect deletes subclause (c) from clause (5). Probably the sentence referring to section 57(h) is intended to apply only when a secured creditor desires to value his security for the purpose of determining the amount for which he may file an unsecured claim; but, whatever the sentence means, it cannot by implication destroy the express authority conferred by subclause (c) of clause (5) to appraise the value of "interests, claims or liens." Determination by appraisal of the worthlessness of second and third mortgage liens was inferentially sustained by the Supreme Court in Re 620 Church Street Building Corp., 299 U.S. 24, 57 S.Ct. 88, 81 L.Ed. ——.

In our opinion, that case also resolves against the appellants the contention that the statute, so construed, is unconstitutional. Although the opinion does not expressly state that deprivation of the right to a judicial sale was the argument advanced for unconstitutionality, we think this is apparent from the fact that certiorari was granted because of an asserted conflict with Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L. Ed. 1593, 97 A.L.R. 1106. No such conflict was found to exist. There is an obvious distinction between depriving a lienor of the right to foreclose a security without giving him equivalent value, as in the Radford Case, and refusing him foreclosure where his lien is concededly worthless, as in the Church Street Case. The appellants rely upon Tennessee Pub. Co. v. American Nat. Bank, 299 U.S. 18, 57 S.Ct. 85, 81 L.Ed. ——, to show that the Church Street Case can have no such scope as we have given it. But, were we to accept their contention that it has not determined the constitutionality of subdivision (b) (5) (c), and were we to approach the question de novo, our decision would not be different. Although the sale of property is often the best way to find its value—in a sense it is its value—we are not prepared to say it is the only permissible method. Any other reasonable method of ascertainment should serve as well; the essential thing is to give the mortgagee the benefit of that value. Reasonable methods of ascertaining it are obviously open to Congress without infringing the Fifth Amendment. An illustration may be found under sections 77 and 77B (as amended [11 U.S. C.A. § 205, 207]) in the provisions requiring a minority bondholder to accept securities under a plan which has been accepted by two-thirds of his class and approved by the court. A dissenting secured creditor is thus deprived of his security without a public judicial sale at which he may bid, yet it can hardly be doubted that such a method of ascertaining the value of his security and giving him its equivalent is constitutional. Continental Illinois Nat. Bank & Trust Co. v. Chicago, R. I. & P. Ry. Co., 294 U.S. 648, 673, 55 S.Ct. 595, 605, 79 L.Ed. 1110; In re Central Funding Corp., 75 F.(2d) 256, 257 (C.C.A.2); Campbell v. Alleghany Corp., 75 F.(2d) 947 (C.C.A.4). Even before the enactment of 77B this court expressed the view that the value of the assets of a corporation in receivership might be ascertained upon a hearing before a master and without public sale. Coriell v. Morris White, Inc. (C.C.A.) 54 F.(2d) 255. Although the case was reversed in National Surety Co. v. Coriell, 289 U.S. 426, 53 S.Ct. 678, 77 L.Ed. 1300, 88 A.L.R. 1231, reversal was not upon the ground that a judicial sale is a prerequisite to reorganization in

equity. In the case at bar the appellants had an opportunity to litigate the question of the value of their security, and they do not now challenge the finding that it was worthless. On the issue of the constitutionality of this procedure, we are satisfied that the appeal is without merit. See In re New York, N. H. & H. R. Co., 16 F.Supp. 504 (D.C.Conn.); Provisions for Non-Assenting Classes of Creditors in Bankruptcy Reorganizations, 46 Yale L.J. 116; In re Garfield Arms Hotel Building Corp.[1]

■ The appellants' next contention is that the court erred in confirming the plan of reorganization because it provides for payment of income and franchise taxes. The claim of the United States for income taxes for the years 1931 and 1932 amounts to $447.77; that of the state of New York for franchise tax for the year 1931 to $160. The appellants are mistaken in saying that franchise taxes for the years 1930 and 1932 to 1935 are also included. The last day to file claims was May 16, 1935, and, though the state filed a notice of intention to file a claim for those years, it never did so. The decree allowed the claims of class D creditors "in the amounts of such claims as filed"; hence it is clear that the tax claims allowed total in all only the insignificant sum of $607.77. Nevertheless the appellants argue that, since the second mortgage lien is superior to the liens of these taxes, the latter cannot be paid to the exclusion of the former. It is not clear whether their contention is that this constitutes discrimination making the plan unfair and violative of the Fifth Amendment, or that it invalidates the plan under the principle of the Boyd Case (Northern Pac. Ry. Co. v. Boyd), 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931. The appellee suggests that the matter should be brushed aside as de minimis. Authority for such treatment can be cited. Brockett v. Winkle Terra Cotta Co., 81 F.(2d) 949, 952 (C.C.A.8); Friendly, "Some Comments On The Corporate Reorganizations Act," 48 Harv.L.Rev. 39, 79, 80. But we prefer to rest decision on another ground. Under the provisions of the first mortgage the trustee named therein was authorized to pay all taxes imposed upon the mortgagor, which it should fail to pay, and any sums so paid by the trustee were made a first lien upon the property, prior even to the first mortgage bonds. It is purely a matter of form and of no consequence to the second mortgagee whether the trustee shall pay the taxes and thereby increase the first mortgage lien, or whether the plan shall provide for their payment. The appellants have no basis for complaint as to payment of the taxes.

■ Finally, the appellants contend that the court erred in finding that two-thirds of the first mortgage bondholders had assented to the plan. This is a question which the appellants may raise despite their lack of any equity in the property. By subdivision (f) (3) of section 77B (11 U.S.C.A. § 207(f) (3) acceptance as provided in subdivision (e) (1), 11 U.S.C.A. § 207 (e) (1) is made a condition precedent to confirmation of the plan. In Downtown Inv. Ass'n v. Boston Metropolitan Bldgs., 81 F.(2d) 314, 321 (C.C. A.1), it is said that compliance with subdivision (e) (1) is necessary "before the court has jurisdiction to confirm a plan." Whether it is truly jurisdictional we need not decide. Even if it be only a condition precedent to lawful confirmation, an order which confirms a plan without the requisite consents may be questioned by a second mortgagee, for he cannot be deprived of his remedy of foreclosure merely by proof that the first mortgage indebtedness is greater than the value of the property. Unless the statute takes that remedy away, he may insist upon it. Section 77B does take it away, but only on condition; therefore he may insist that the condition be fulfilled. Nor can the question be avoided, as the appellees urge, on the theory that the court's finding that valid consents were filed on behalf of more than two-thirds of the first mortgage bondholders is conclusive on appeal. The validity of the consents involves questions of law, so that the finding is not a mere finding of fact. Accordingly we must look into the merits of the appellants' contention.

■ The outstanding first mortgage bonds total $371,000, and the requisite two-thirds thereof is $247,333.33. Holders of $258,500 of bonds had deposited their bonds with the Real Estate Bondholders Protective Committee, appellees. On July 23, 1935 the committee sent to each depositor a copy of the proposed plan of reorganization, accompanied by a notice that any depositor who did not withdraw his bonds and file notice of dissent from the plan

---

[1] No opinion for publication.

within twenty days would be deemed to assent to the plan and to authorize the committee to assent on his behalf. No depositor withdrew his bonds, but two depositors whose bonds aggregated only $3,000 expressed dissent. Thereafter, on October 18, 1935, the committee accepted and approved the plan on behalf of $255,500 of the deposited bonds. A few days later, by letter of October 29, 1935, the committee notified the depositors that the plan had been so accepted, and that it would be brought on for confirmation by the court on November 13th. The letter also stated that the committee had received an offer for the purchase of all the deposited bonds at 50 per cent. of their face value, and an offer for the purchase of the property at a valuation equal to about 65 per cent. of the face value of the bonds. The committee did not recommend the acceptance of either offer but intended to bring them to the attention of the court, and, "to guide the Committee in its final recommendations to the court," depositors were requested to indicate whether they desired to accept either offer. Depositors who preferred the plan of reorganization were told that they need not reply. In response to this letter depositors holding $85,000 of bonds expressed a preference for acceptance of one or the other of the offers. With these facts before it the court permitted the committee to vote the deposited bonds for the plan of reorganization and stated in its opinion approving the plan that "more than two-thirds of the bondholders have accepted the plan." We find no error in this. The expression of a preference for the sale of the bonds or the property was not equivalent to cancellation of the committee's authority to vote on behalf of the depositors, even if it be assumed that revocation of such authority could be effected without complying with the provisions of the deposit agreement concerning withdrawal therefrom.

 A more serious attack upon the validity of the bondholders' assent to the plan is based upon events occurring subsequent to the hearing of November 13th. Several months later the committee petitioned for approval of certain modifications of the plan, and on March 25, 1936, an order was entered setting a hearing thereon for April 17th and providing that any holder of non-deposited bonds who had previously accepted the plan might withdraw his acceptance by filing in the office of the clerk of the court on or before April 16th a notice to that effect, and any holder of deposited bonds who had previously accepted the plan might withdraw his acceptance upon the terms set forth in "Exhibit D." This exhibit gave notice that "Any depositor who by reason of said changes and modifications desires to withdraw from said Plan and the Deposit Agreement, may do so, but only upon surrender of his Certificate of Deposit on or before April 16, 1936 at the City Bank Farmers Trust Company * * * and upon payment on or before that date of his ratable proportion of the Committee's expenses and disbursements."

No depositor fulfilled these conditions or offered to surrender his certificate, but on April 16th depositors of bonds in the amount of $44,500 filed dissents with the clerk of the court. Nevertheless the committee voted all deposited bonds in favor of the modified plan, and, notwithstanding an objection by the Klee Corporation that the acceptance required by section 77B (e) (1), 11 U.S.C.A. § 207 (e) (1) was lacking, the plan was confirmed, the order stating that 71 per cent. of the bondholders had assented. No bondholder or depositor has appealed; the second mortgagees alone challenge the order of confirmation.

By the terms of the deposit agreement, a depositor gave the committee a power of attorney to vote his bonds, revocable only by his withdrawal from the agreement. Withdrawal was conditioned upon surrender of the depositor's certificate of deposit and payment of his proportionate share of the committee's expenses and compensation, which the committee was empowered to fix in its own discretion. The order of March 25th made these conditions less onerous. It withdrew the condition as to payment of a share of the committee's compensation. Moreover, in the order of confirmation the court reserved jurisdiction to enter further orders, and this would doubtless embrace the power to pass upon the committee's expenses and disbursements and the apportionment of them among depositors, should dispute arise. The court's power to modify provisions of a deposit agreement is found near the end of subsection (b) of section 77B (11 U.S.C.A. § 207(b), as follows: "For all purposes of this section any creditor may act in person, by an attorney at law, or by a duly authorized agent or committee: Provided, That the judge shall scrutinize and may disregard any limitations or provisions of any depositary agreements, trust inden-

tures, committee or other authorizations affecting any creditor acting under this section and may enforce an accounting thereunder or restrain the exercise of any power which he finds to be unfair or not consistent with public policy."

By virtue of this provision, recognition of the committee's power to vote the deposited bonds is within the court's discretion. In re Wabash-Harrison Bldg. Corp., 85 F.(2d) 395 (C.C.A.7). Such discretion·must be exercised in accordance with what the judge finds to be fair and consistent with public policy. The appellants' present contention is really an assertion that it is unfair and violative of public policy to permit the committee to vote the bonds of a depositor contrary to his expressed wish, although he makes no attempt to withdraw his bonds from the deposit agreement. We do not think this proposition can be successfully maintained. The depositor must be permitted to withdraw on reasonable terms, but we see nothing unfair or contrary to public policy in requiring him to withdraw, if he wishes to act independently of the other depositors. He should not be allowed to play fast and loose; either he is a member of the group, or he is not. So long as he is, the committee should· have power to bind him, for otherwise it will never know what backing can be counted upon for any plan it may propose. See Douglas, 47 Harv.L.Rev. 565, 570. In requiring surrender of the certificate of deposit as a condition of withdrawal, the order of March 25th imposed no unreasonable requirement.

The order also required a withdrawing depositor to pay his share of the committee's expenses incurred up to the time of withdrawal. This was an unknown sum. If it could not be ascertained in time to permit withdrawal on the date when the depositor wished to exercise his right to vote independently, or if cash payment had been shown to be impossible, or possibly even if shown to be merely inconvenient, the condition might perhaps be found invalid with respect to a depositor so affected. Compare Habirshaw Elec. Cable Co. v. Habirshaw Elec. Cable Co., Inc., 296 F. 875, 43 A.L.R. 1035 (C.C.A.2). Nothing of this sort appears with respect to any depositor except Blanche G. Reilley. The committee's vote of her $2,000 of bonds may be thrown out without affecting the result. None of the other dissenting depositors gave any indication of a desire to withdraw from the group. Apparently they wished to remain in· the group but to vote independently. To refuse them permission to do this we believe to have been within the discretion of the District Court. Their contract of deposit bound them to withdraw if they wished to vote independently; the terms upon which they were permitted to withdraw were not shown to be oppressive or difficult of performance; they made no effort to comply, and expressed no desire to withdraw unless this be inferred from their desire to vote independently. Under these circumstances we are not prepared to hold that the judge was compelled to restrain the committee from exercising in good faith and in the interest of depositors the voting power conferred upon it by the deposit agreement.

Moreover, none of the dissenting depositors has taken any appeal. So far as appears, they may have again changed their minds and may now be perfectly satisfied with the action taken by the committee in their behalf. The appellants are asserting that the vote on dissenting depositors' bonds was unauthorized by them. Even if it be assumed that it was, it is not apparent why their subsequent acquiescence might not validate it. Hence we think the appellants are in no position to contend that the committee voted without authority.

Decree affirmed.

L. HAND, Circuit Judge (dissenting).

I recognize of course that a reörganization committee must be protected, and that it may for that purpose reserve a lien for its expenses and its compensation upon· the depösited securities. Perhaps it should be free even to vote on them against the will of their owners, so far as that may be necessary to protect the lien; that power this committee does not need, for the bonds have ample value to secure it whether this reörganization goes through; or not. But except such a lien I can see no other legitimate interest that it can have; it seems to me an oppressive condition to require a depositor to abandon to the committee all power of choice, unless he pays his proportion of the expenses and withdraws. I do not understand that my brothers disagree so far; what they say is that if the dissenters were not content to be bound by the committee's judgment, they should have at least declared that they wished to withdraw; that they should

not be allowed to continue to enjoy the advantages of the committee's activities, and yet oppose its decision as to the plan. So far as such an enforced conformity might be necessary for any legitimate purpose of the enterprise, this too might be reasonable; but I cannot see that it was necessary here. Such a committee is formed to protect the interests of the whole class by putting those in charge who will follow the proceeding, advise themselves of the value and prospects of the property, protect it, prepare plans for its reörganization, advertise them, get the court's consent if enough depositors accept, and set up the new company. None of these purposes require the depositors' surrender of their right to vote, and the statute clearly means that in general they shall choose personally. Reörganization merely as such is not an added purpose of such associations; no plan may turn out to be available which is better than liquidation; or a better plan may be found than that proposed. The committee will still be useful in either case, and it is needlessly oppressive to deny to a depositor its services, unless he will consent to abdicate. I would ban all such powers; they are of the kind which the statute discountenances. I know of course the opportunities opened for blackmail, but we must not forget that the statute is coercive in any case, and we ought to be jealous to see that the conditions upon its sanctions are fulfilled.

Therefore I can see no inconsistency in a depositor's remaining a depositor and voting as he likes. But even if this be not true, these depositors were not advised of any power to withdraw from the group except upon paying their share of the expenses; in the notice sent out on March 27, 1936 (Exhibit D), withdrawal was expressly made conditional upon such a payment. They got no intimation of any other means of withdrawal by which they could preserve their franchise; it was too much to expect them to divine that they might withdraw in the face of this position taken by the committee. Thus whatever may be said as to the general question, this order at any rate can be affirmed only on the theory that the committee had the power to vote in the name of all depositors who would not pay their aliquot share of the expenses. That in my judgment ought certainly to be unlawful. For both these reasons I think that the plan was never approved.

*Writ of certiorari denied 57 S.Ct. 785, 81 L.Ed. —.